IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| LARRY LEE LEMAY, | ) |
| Plaintiff, | ) ) |
| | ) NO. 3:19-cv-00683 |
| v. | ) JUDGE RICHARDSON |
| | ) |
| CORRECT CARE SOLUTIONS, et al, | ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION & ORDER

Pending before the Court are *pro se* Plaintiff Larry Lee Lemay's second and third motions for temporary restraining orders ("TRO") filed in this action.[1] On July 27, 2020, Plaintiff filed a Motion for Temporary Restraining Order, Order to Show Cause, and Preliminary Injunction (Doc. No. 64, "Second Motion for TRO"), and a supporting declaration (Doc. No. 65). On July 29, 2020, Defendant Correct Care Solutions/Wellpath, LLC ("Wellpath") responded (Doc. No. 20, "Response") and, with the permission of the Court, filed additional materials in support of its Response on July 31, 2020 (Doc. No. 74). Also on July 29, 2020, Plaintiff filed a third Motion for Temporary Restraining Order, Order to Show Cause and Preliminary Injunction (Doc. No. 69, "Third Motion for TRO"), and a supporting declaration (Doc. No. 70). For the reasons discussed below, Plaintiff's Second Motion for TRO and Third Motion for TRO is DENIED.

## BACKGROUND

Plaintiff initiated this action on August 7, 2019, asserting claims against Wellpath, Davidson County Sheriff Daron Hall, the Davidson County Sheriff's Office, and Officer Keyonna

---

[1] Plaintiff filed his first Motion for Temporary Restraining Order and Order to Show Cause and Preliminary Injunction (Doc. No. 18, "First Motion") on October 24, 2019. The First Motion was denied as moot on October 30, 2019. (Doc. No. 22).

Alexander, pursuant to 42 U.S.C. § 1983, based on alleged deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment to the United States Constitution and violations of his due process rights under the Fourteenth Amendment. (Doc. No. 1). Plaintiff's original Complaint arose from events allegedly occurring between approximately June 27, 2019 and July 1, 2019. According to Plaintiff, he was booked into the Hill Detention Center, a jail facility operated by the Davidson County Sheriff's Office, on June 27, 2019. He allegedly told medical staff upon intake that he is diabetic, uses an insulin pump, and typically takes 1.8 units of insulin per hour. He claims that despite providing this information, he was not given a diabetic diet and that his blood-sugar level was not adequately monitored.

The next day, June 28, the medical staff allegedly disconnected and took away his insulin pump. Thereafter, allegedly he was not provided adequate amounts of insulin to take orally. By June 29, Plaintiff claims, he was feeling very ill. Allegedly, he notified Officer Alexander, who told him she would tell medical but did not do so. According to Plaintiff, when he finally was seen by medical that afternoon, his blood-sugar and ketone levels were so high that he was taken to the hospital via ambulance and admitted for treatment of diabetic ketoacidosis, a life-threatening condition resulting from the lack of adequate levels of insulin. As a result of this incident, he allegedly suffered acute kidney damage.

On June 12, 2020, Plaintiff filed an Amended Complaint adding new defendants and asserting new facts in support of his § 1983 claim. (Doc. No. 58). The new allegations that form the basis of Plaintiff's Amended Complaint encompass four events: (1) Plaintiff's request for and denial of Gabapentin 300 mg; (2) Plaintiff's pending request for a Continuous Glucose Monitor (CGM); (3) a disciplinary action brought against Defendant for alleged possession of contraband, possessing property without authorization, theft, violating housing rules, smuggling, and hoarding

medication; and (4) the inadequacy of the law library. Only the second event is relevant to the instant motions.[2]

Specifically at issue is Plaintiff's allegation that on April 27, 2020, Plaintiff was sent to Meharry General Hospital where he saw Dr. Tiwalade Awosanya.[3] Plaintiff claims that Dr. Awosanya "ordered" that he use a Continuous Glucose Monitor (CGM). As of June 3, 2020, Plaintiff was allegedly informed that approval for the CGM was still pending with Wellpath. Plaintiff provided additional facts in support of this claim in his Second Motion for TRO.

## LEGAL STANDARD

Temporary restraining orders ("TRO") and preliminary injunctions are considered preventive, prohibitory, or protective measures taken pending resolution on the merits, *see Clemons v. Board of Educ. of Hillsboro, Ohio*, 228 F.2d 853, 856 (6th Cir. 1956), and are considered extraordinary relief. *See Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972). A TRO should be granted only if the movant carries his burden of proving that the circumstances clearly demand it.

---

[2] The first event, regarding Plaintiff's allegation that he requested and was denied Gabapentin 300 mg, is relevant to Plaintiff's First Motion for a TRO, has been resolved. Nevertheless, the Court will briefly summarize these allegations: Plaintiff alleges that in early September 2019, Wellpath sent him to Eskind Diabetes Center to see Dr. Rhee, where he was proscribed Gabapentin 300 mg twice a day for his diabetic neuropathy pain. Plaintiff alleges that in September or October 2019 he was told by Defendant Baily that his request to Wellpath for Gabapentin was denied. Plaintiff filed his first motion for a temporary restraining order alleging that he had been continuously deprived of medical treatment and prescription medication while incarcerated at the Hill Detention Center and that Wellpath's failure to prescribe him Gabapentin was a violation of his Eighth Amendment right. (Doc. No. 18 at 2). In response to Plaintiff's First Motion, Wellpath informed the Court that during a scheduled appointment on October 29, 2019—pursuant to Wellpath's pain protocol—Plaintiff was prescribed Gabapentin. (Doc. No. 20 at 4; Doc. No. 21-1 at 3). Plaintiff alleges that it is his belief that his request for Gabapentin was only approved as a result of his First Motion for a TRO.

[3] Plaintiff refers to "Dr. Awosanya" as "Dr. Oswana."

3

*Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The court must consider and balance four factors in determining whether to afford such relief: (1) the likelihood of the plaintiff's success on the merits; (2) whether the plaintiff will suffer irreparable injury without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the injunction's impact on the public interest. *Nat'l Viatical, Inc. v. Universal Settlements, Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013).

Although these four factors are "factors to be balanced, not prerequisites that must be met," *Michael v. Futhey*, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009) (quoting *Six Clinic Holding Corp., II v. Cafcomp Systems*, 119 F.3d 393, 400 (6th Cir. 1997), they do not carry equal weight. Regarding the third factor, irreparable harm, "even the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.'" *D.T. v. Sumner Cty. Schools*, 2019 WL 5850408, at *2 (6th Cir. Nov. 8, 2019); *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("The demonstration of some irreparable injury is a sine qua non for issuance of an injunction."). Furthermore, "[a] finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzalez v. Nat'l Bd. of Medical Exam'rs*, 225 F. 3d 620, 625 (6th Cir. 2000). In deciding whether to grant the requested TRO, the Court makes its evaluation of these factors based on the current record. The Court does not intend to suggest that any of its findings herein are not subject to potential change at later stages in this case based on a changing record.

## ANALYSIS

I.  Second Motion for TRO

In his Second Motion for TRO, Plaintiff alleges that Defendants have been deliberately indifferent to Plaintiff's medical needs while he has been incarcerated at the Hill Detention Center. (Doc. No. 18 at 2). Specifically, Plaintiff argues that Defendants have declined to provide him

medically ordered treatment, including a proscribed CGM and surgical procedures to treat his varicose vein disease. (Doc. Nos. 65 & 65).

First, Plaintiff claims that on April 27, 2020 during a scheduled appointment at Meharry General Hospital, Dr. Awosanya "ordered or prescribed" for Plaintiff a CGM to monitor his blood-sugar levels. Plaintiff claims that on or around May 22, 2020, he had a follow-up appointment with Dr. Sabrina Finney, a "Facility doctor," during which Dr. Finney allegedly stated that a CGM would more adequately control his blood-sugar level and therefore also ordered or prescribed for Plaintiff a CGM and submitted an order for the same to Wellpath. At the time the instant motions were filed, Plaintiff had not been provided a CGM.

Second, Plaintiff claims that on November 5, 2019, he met with Mary Lynn Fair, RN to discuss heaviness, weakness, pain, and decreased ability to stand due to varicose veins. At that time, Plaintiff purportedly signed a release to allow Defendants to obtain records from Siragusa Vein & Laser Center ("Siragusa").[4] According to Plaintiff, in early 2019 (prior to his incarceration), he had laser vein surgery on his left leg and was told he would need more procedures on both of his legs. In February 2020, Plaintiff allegedly signed another release to allow Defendants to retrieve his medical records from Siragusa. Plaintiff contends that he is currently having some pain, heaviness, and weakness, and that he is unable to stand for more than fifteen minutes. He claims that this is due to the varicose vein disease. Plaintiff argues that Wellpath is purposely not providing him treatment or obtaining records regarding his varicose vein disease. Plaintiff requests that the Court order Wellpath to provide the treatment and laser surgery as prescribed to him by

---

[4] Plaintiff spells this Seragusa but the Court believes that the correct spelling is Siragusa. *See* Siragusa Vein & Laser, https://www.nashvilleveincenter.com/ (last visited Aug. 3, 2020).

Siragusa and provide the use of a CGM as prescribed by both Dr. Awosanya and the facility physician.

In response, Defendants argue that Plaintiff's request should be denied because (1) Plaintiff cannot succeed on the merits of his claim that Wellpath is violating his constitutional rights; (2) Plaintiff will not suffer irreparable harm without the requested injunction; (3) requiring Wellpath to honor Plaintiff's preferences for medical care—above what Defendants contend is medically necessary—will impose a significant strain on Wellpath's available resources, and (4) Plaintiff's requested injunction is not in the public's interest.

"The right to adequate medical care is guaranteed to convicted federal prisoners by the Cruel and Unusual Punishments Clause of the Eighth Amendment, and is made applicable to convicted state prisoners and to pretrial detainees (both federal and state) by the Due Process Clause of the Fourteenth Amendment." *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). In the context of medical care, a prisoner's Eighth Amendment right to be free from cruel and unusual punishment is violated only when the prisoner can demonstrate a "deliberate indifference" to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976). "Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir.1976) (citations omitted).

Plaintiff has failed to demonstrate that he is entitled to injunctive relief. He has shown neither a likelihood of success on the merits nor irreparable injury. Rather, the evidence in the record reveals that Plaintiff's Eighth Amendment claim is more likely a disagreement with Defendants' choice of treatment than deliberate indifference towards Plaintiff's medical needs.

6

First, regarding Plaintiff's claim that Defendants have deliberately ignored orders and prescriptions for a CGM to monitor Plaintiff's glucose level, both Plaintiff and Defendants have presented evidence demonstrating that Plaintiff is receiving treatment for his diabetes. Specifically, Defendant Wellpath monitors Plaintiff's glucose three times a day using fingerstick glucose checks, it has arranged and facilitated appointments for Plaintiff to see outside endocrinologists, its providers have discussed Plaintiff's care with those outside providers, and Plaintiff is provided a diabetic diet. Although Plaintiff acknowledges this treatment, he contends that Defendants have been deliberately indifferent to his medical needs and intentionally denied him medical care by declining to provide him with a CGM.

As an initial matter, the Court notes that Defendants' Response in opposition to Plaintiff's Second Motion for TRO (Doc. No. 68, "Defendant's Response") appears to omit some of the same facts laid out in the Affidavit of Melinda Stephens, RN, HSA filed in support of Defendants' Response (Doc. No. 74-1, "Stephens Affidavit"). In particular, the Response does not mention Plaintiff's appointment with and (the subsequent report of) Dr. Awosanya. Rather, the Response mentions only "a suggestion from [Dr. Rhee,] an endocrinologist at the Eskind Diabetes Center[,] to 'consider' a continuous glucose monitor." (Doc. No. 68 at 4). According to the Stephens Affidavit, however, "Dr. Awosanya apparently recommended a continuous glucose monitor to address [Plaintiff's] self-reported hyperglycemia following jail meals." (*Id.* at 3 (citing Ex. A, CCS001720-001723)). Upon review, it appears that, in his report, Dr. Awosanya stated that Plaintiff "will need a Medtronic COntinuous [sic] glucose monitor to assist with better management of his DM." (Doc. No. 74-2 at 46 (Exhibit A, CCS001772)). The report also states, "I *recommend* he gets a continuous glucose monitor by medtronic to assist with his insulin

7

administration." (*Id.* (emphasis added)). The absence of any reference to this recommendation in Defendant's Response is somewhat conspicuous.

Despite this discrepancy, Plaintiff nevertheless fails to demonstrate a likelihood of success on the merits of his Eighth Amendment claim. Even if the Court were to accept as true Plaintiff's assertion that Dr. Awosanya prescribed him (as opposed to merely recommended he use) a CGM, Defendants' decision to pursue a different treatment does not amount to deliberate indifference of Plaintiff's medical needs. Indeed, the record demonstrates that Plaintiff has been and continues to receive alternative treatment to address his diabetes, including using an insulin pump, regular fingerstick glucose checks, a diabetic diet, and multiple trips to see outside specialists. (Doc. No. 74-1 at 1-2). Further, the record demonstrates that Defendants did consider whether to provide Plaintiff with a CGM but ultimately determined it not to be medically necessary.[5] Thus, the Court cannot, *at this stage*, say Plaintiff is likely to succeed on the merits of his Eighth Amendment claim regarding his denial of a CGM. *See Westlake v. Lucas*, 537 F.2d 857, 860, n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to

---

[5] Specifically, Plaintiff's medical records attached to the Stephens Affidavit state that on January 30, 2020, Nurse Cullen reported that "there does not appear to be any real benefit in obtaining a CGM in this setting as he would still need to come to the clinic TID to have the BG sensor scanned." (Doc. No. 74-2 at 54 (Ex. A, CCS001938-001940)). The Stephens Affidavit also states that on May 22, 2020, Sabrina Finney, MD, ordered a CGM for Plaintiff. (Ex. A, CCS001905). On July 24, 2020, Dr. Finney subsequently cancelled that order for a CGM based on (1) her review of Plaintiff's chart after the May 22, 2020 visit and (2) an endocrinology consult on January 30, 2020. (See, Ex. A, CCS002099-002100). To be sure, the Court is somewhat suspicious of the motive for the cancellation of the CGM order—which occurred after Plaintiff filed his Amended Complaint, which included allegations regarding the CGM—but such suspicion is not enough to show that Plaintiff has demonstrated a likelihood of success on the merits of his claim. Plaintiff will be able to further explore this subsequent cancellation during discovery. But, based on the record at this stage, it appears on balance that Defendants were not indifferent to Plaintiff's medical needs but rather reviewed the orders or recommendations made by the outside providers and—using their professional judgment—chose to pursue a different course of action.

constitutionalize claims which sound in state tort law[.]"); *Bruce v. Ylst*, 351 F.3d 1283, 1290 (9th Cir. 2003) ("[F]ederal courts must remember that the duty to protect inmates' constitutional rights does not confer the power to manage prisons or the capacity to second-guess prison administrators, for which we are ill equipped[.]").

Plaintiff's claim that Defendants' refusal to provide him surgery for his varicose veins fares no better. Plaintiff contends that Defendants are purposely not providing him treatment or obtaining records regarding his varicose vein disease. But again Defendants have provided evidence demonstrating that they have not been deliberately indifferent to Plaintiff's condition. To the contrary, the record demonstrates that Plaintiff has had multiple exams—as early as August 9, 2019 and as recently as July 21, 2020—to monitor his varicose veins. Specifically, the Stephens Affidavit states that on June 23, 2020, Plaintiff saw a Wellpath provider at the Davidson County Sheriff's Office to address complaints of an intermittent aching sensation in his right lower leg. The Wellpath provider, "physically evaluated [Plaintiff], not[ed Plaintiff'] was wearing compression socks; varicose veins in the right lower leg; no erythema; and negative Homan's sign with no palpable cords (both physical indicators of no deep vein thrombosis)." (Doc. No. 74-1 at 5-6). The provider also ordered an ultrasound of Plaintiff's right lower leg, which Plaintiff underwent three days later. The ultrasound was interpreted by a doctor who determined that there was "no evidence of deep vein thrombosis in the right femoral popliteal venous system." (*Id.*). Based upon the ultrasound, the doctor also found normal compression in the common femoral, superficial femoral, popliteal, and other deep venous structures in the right leg. (*Id.* (citing Ex. A, CCS002098)).[6] Finally, the Stephens Affidavit states that Defendants received Plaintiff's medical

---

[6] Notably, all of this treatment occurred before Plaintiff filed the Second Motion for TRO, alleging that Defendants have been deliberately indifferent to his medical needs, including regarding treatment of his varicose veins. Additionally, Plaintiff did not specifically raise the issue of his

9

records from Siragusa on July 29, 2020 and that Plaintiff had a follow-up visit on July 30, 2020 "to again evaluate his varicose vein issues, discuss the results of the June 26 ultrasound, and further develop the ongoing plan of care for addressing the varicose veins." (*Id.* at 6).

Based on this robust record of treatment, Plaintiff is not likely to succeed on his claim that Defendants have been deliberately indifferent to his medical needs regarding his varicose vein condition. Rather, it appears that Plaintiff's claim stems from his displeasure at the speed at which Defendants have responded to his complaints and their failure, thus far, to order a surgical procedure. However, as noted above, a plaintiff's disagreement with medical personnel's treatment decisions does not rise to the level necessary to support an Eighth Amendment violation claim. *See Chapman v. Parke*, 946 F.2d 894 (TABLE), 1991 WL 203080, at *2 (6th Cir. Oct.4, 1991) ("[A] difference of opinion regarding treatment or his need for surgery is insufficient to state a claim under the Eighth Amendment.").

Although "a finding that there is simply no likelihood of success on the merits is usually fatal" *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir.2000), the Court need not make its decision on its merits analysis alone. Rather, it finds that Plaintiff has also failed to demonstrate that he is likely to suffer irreparably injury absent injunctive relief from the Court. First, Plaintiff argues that "as a matter of law, the continuing deprivation of constitutional rights constitutes irreparable harm." (Doc. No. 64 at 4 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). However, as discussed above, the Court has found that Plaintiff is not likely to succeed on his constitutional claim that Defendants have violated his Eighth Amendment right to receive medical treatment. Therefore, his constitutional claim does not support his argument that he will be

---

varicose veins in the Amended Complaint. Therefore, at the very least, this suggests that treatment was not prompted by, or provided merely in response to, Plaintiff's court filings.

10

irreparably harmed without Court action. *See Dulak v. Corizon Inc.*, 2014 WL 4678085, at *6 (E.D. Mich. June 9, 2014), *report and recommendation adopted*, 2014 WL 4678086 (E.D. Mich. Sept. 18, 2014) ("[B]ecause it appears unlikely, on the current record, that plaintiff will be able to demonstrate that he has a cognizable constitutional claim, he is not entitled to a presumption of irreparable harm based on the alleged constitutional violation.").

Second, Plaintiff argues that if he does not receive the prescribed CGM, he is threatened with irreparable harm because elevated blood sugar levels cause damage to his eyes, heart, kidneys, and other vital organs. (*Id.*). Plaintiff also argues that without treatment for his varicose vein disease, Plaintiff is at risk of other disease, heaviness in standing and walking, and the forming of blood clots. (*Id.*). However, Plaintiff fails to demonstrate (as he must) that this harm is both certain and immediate. *See Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (holding that the moving party must show that irreparable harm is "both certain and immediate, rather than speculative or theoretical"); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon clear showing that the plaintiff is entitled to such relief."). Although Plaintiff presents the irreparable harm he may endure as a result of elevated blood sugar levels in certain terms, in reality, Plaintiff would suffer these harms only if he is unable to monitor and control his blood sugar levels. But Plaintiff has not demonstrated that his current treatment is devoid of adequate monitoring and control and thus insufficient to prevent this irreparable harm.

Regarding the irreparable harm Plaintiff contends he will suffer as a result his varicose vein disease, Plaintiff specifically notes that *without treatment* varicose veins can lead to other diseases, heaviness in standing and walking, and blood clots. However, as discussed above, the record shows

11

that Defendants have been monitoring and continue to monitor closely Plaintiff's varicose veins. Currently, this monitoring has not indicated an immediate need for the surgery Plaintiff argues he needs. In light of this, Plaintiff has failed to show that he is likely to suffer irreparable harm absent injunctive relief.

Given Plaintiff's inability to demonstrate a likelihood of success on the merits of his claim and his inability to show certain and immediate irreparable harm, it is not necessary to discuss the other *Overstreet* factors. Accordingly, Plaintiff's Second Motion for TRO will be denied.

II. Third Motion for TRO

In his Third Motion for TRO, Plaintiff requests the Court enter an order enjoining Defendants Daron Hall and Metro Davidson County, from delaying or interrupting his outgoing legal mail, including to the courts, Defendants' counsel, and Plaintiff's criminal case counsel, and his incoming legal mail.

Plaintiff is not entitled to the injunctive relief requested, because the basis for his motion is entirely unrelated related to the claims made in his Amended Complaint. In his Amended Complaint, Plaintiff brings claims under the Fourteenth Amendment for violations of his due process rights and the Eighth Amendment for deliberate indifference. More particularly, Plaintiff alleges that he was denied due process when Defendants initiated disciplinary proceedings against him and proceeded to find him guilty of alleged possession of contraband, possessing property without authorization, theft, violating housing rules, smuggling, and hoarding medication. (Doc. No. 58 ¶¶ 65-75). In addition, the Amended Complaint Plaintiff includes two Eighth Amendment claims in his: one about deliberate indifference to his need for a CGM (Count I) and one for deliberate indifference to his need for surgical procedures to treat his varicose veins (Count II). (*Id.* at ¶¶ 12-64).

"[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." *Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) (alteration in original) (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994)). And a plaintiff has "no grounds to seek an injunction pertaining to allegedly impermissible conduct not mentioned in his complaint." *Id.* at 300; *see also Annabel v. Frost*, No. 17-2263, 2018 WL 5295887, at *2 (6th Cir. Aug. 10, 2018); *Taylor v. United States*, No. 110-cv-01195, 2020 WL 587650, at *4 (W.D. Tenn. Feb. 6, 2020). As explained in *Christian v. Michigan Dept. of Corr. – Health Servs.*, 2013 WL 607783 (E.D. Mich. Jan. 28, 2013),

> A court issues a preliminary injunction in a lawsuit to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits. Thus, a party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint . . . . Although . . . new assertions might support additional claims against the same prison officials, they cannot provide the basis for a preliminary injunction in this lawsuit.

*Id.* at *3 (citing *Devose*, 42 F.3d at 471 (internal citations omitted)). Here, even construing the allegations in Plaintiff's *pro se* Amended Complaint liberally, the bases for Plaintiff's Third Motion for TRO are not related to the allegations in his Amended Complaint. Indeed, Plaintiff's claims regarding alleged interruptions to his incoming and outgoing mail are not clearly tied to his allegations of due process and deliberate indifference, and Plaintiff makes no effort to connect the two. Undeniably, the Amended Complaint does not discuss any issue with mail or access to the Courts. Accordingly, Plaintiff is not entitled to the injunctive relief requested in his Third Motion for TRO. *See Kensu v. Borgerding*, No. 16-13505, 2018 WL 6540262, at *3 (E.D. Mich. Oct. 31, 2018), *R&R adopted*, No. 16-cv-13505, 2018 WL 6527782 (E.D. Mich. Dec. 12, 2018).

## CONCLUSION

After reviewing the briefs, the attachments thereto, and the above-stated standards, for the reasons stated above, Plaintiff's Motion for Temporary Restraining Order, Order to Show Cause,

13

and Preliminary Injunction (Doc. No. 64) and Motion for Temporary Restraining Order, Order to Show Cause and Preliminary Injunction (Doc. No. 69) are **DENIED**.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE